## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **FIRST TENNESSEE BANK** | ) | |
| **NATIONAL ASSOCIATION,** | ) | |
| | ) | **CIVIL ACTION** |
| **PLAINTIFF,** | ) | |
| | ) | **NO. 1:15-CV-2940-CAP** |
| **v.** | ) | |
| | ) | |
| **SERVICE FOODS INC., ET AL.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO COMPEL NON-PARTY STUART KAGAN TO ANSWER QUESTIONS IN CONTINUED DEPOSITION [DKT. 234]

The Special Master, Byung J. "BJay" Pak of Chalmers Pak Burch & Adams LLC, hereby files this Report and Recommendation on Plaintiff First Tennessee Bank's ("First Tennessee" or "Plaintiff") Motion to Compel Non-Party Stuart Kagan ("Kagan") to Answer Questions in Continued Deposition [Dkt. 234].

For the reasons stated below, the Special Master recommends that the Motion be denied in part, and be granted in part.

## I.     BACKGROUND

### A.  Claims in the Complaint

On August 19, 2015, Plaintiff First Tennessee brought this lawsuit against

Defendants Service Foods Inc. d/b/a Blue Ribbon Foods ("Service Foods"), Southern Division LLC d//b/a/ Southern Foods ("Southern Division"), H-Son Financial Inc. d/b/a Jefferson Financial ("H-Son"), Harold T. Pounders ("Pounders") and Keith Kantor ("Kantor") alleging various claims ranging from breach of a loan agreement and related guarantees to conversion.  [Dkt. 17].  The Plaintiff filed a First Amended and Restated Complaint on September 23, 2015.[1]

   B.  Relevant Factual Allegations[2]

   On or about November 30, 2006, Service Foods entered into a loan transaction with First Tennessee, whereby First Tennessee agreed to make advances on a revolving credit basis of up to $6.5 million dollars ("Loan Agreement").  In connection with the Loan Agreement, Pounders, Kantor and H-Son signed as guarantors of the Loan Agreement.  Pounders and Kantor were shareholders of Services Foods and H-Son. Service Foods also granted as collateral a first-priority security interest in certain assets of Service Foods, including, but

---

[1] In the Amended Complaint, Plaintiff alleged breach of the loan documents and the related guarantees (Counts I-V); conversion claims against Pounders and Kantor (Counts VI-X); fraud claims against Pounders and Kantor (Counts XI-XIII); breach of fiduciary duty, and for punitive damages against Pounders and Kantor (Counts XIV-XVI). Although Defendants Kantor and Pounders filed an Answer on October 15, 2015 and January 12, 2016, respectively, *see* [Dkts. 21; 49], on March 6, 2017, the parties agreed to a consent judgment as to Counts I-V. *See* [Dkt. 328].  There is an entry of default against the remaining defendants.

[2] For the limited purposes of issuing a Report and Recommendation, the factual allegations contained in the Amended Complaint will be considered as true.

not limited to, any and all accounts, accounts receivable, notes receivable, contract rights, and other proceeds of any kind.

The terms of the Loan Agreement were extended many times, and the credit was ultimately increased to $10.25 million through a series of Amendments to the Loan Agreement.  Importantly, in September 2007, Southern Division was added as a guarantor of the Loan Agreement.  Kantor is a member of Southern Division and was involved in the day-to-day management of Southern Division.  Pounders is believed to be a principal of Southern Division.

As a part of Southern Division's guarantee, it granted a first-priority security interest in certain assets of Southern Division, including, but not limited to, any and all accounts, accounts receivable, notes receivable, contract rights, and other proceeds of any kind.  As of July 28, 2015, the principal balance of $10.25 million was outstanding, along with over $590,000 in additional principal as funded overdrafts and interest.  Service Foods and Pounders, Kantor, and H-Son allegedly have not repaid any of the amounts due and are in default of the Loan Agreement and the related amendments and guarantees.

While the First Amended Complaint contains numerous counts, only the allegations surrounding Counts 6-13 are relevant to the Motion under consideration and warrant further discussion.

1.     Conversion and Diverted Funds Allegations [Counts 6 – 10]

In June of 2015, Whitebridge Financial LLC ("Whitebridge") agreed to purchase from Service Foods and Southern Division certain customer accounts and contracts to which First Tennessee claims a first-priority security interest. Pounders, who is believed to be a principal of Service Foods and Southern Division, managed the sale of the customer accounts and contracts to Whitebridge. The proceeds of the sale were supposed to be sent to First Tennessee, pursuant to a pre-existing intercreditor agreement between Whitebridge and First Tennessee. Despite knowing the existence of the intercreditor agreement between Whitebridge and First Tennessee, Pounders and Kantor allegedly directed Whitebridge to send the sales proceeds in the amount of $58,524.62 to a Bank of North Georgia Account in the name of H-Son – an account over which Pounders and Kantor had exclusive control.  According to Plaintiff, Pounders and Kantor have so far refused to account for or remit the sales proceeds.

Similarly, First Tennessee alleges that, from February 1, 2015 to approximately June 30, 2015, Service Foods sold its accounts and related contracts to Equitable Acceptance Corporation ("EAC").  EAC paid $485,180.73 for the accounts.  Pounders and Kantor allegedly directed Service Foods to deposit the proceeds into the Bank of North Georgia Account in the name of H-Son.  Pounders

and Kantor have so far refused to account for or remit the sales proceeds.

First Tennessee also alleges that Pounders and Kantor misappropriated funds that served as collateral for its loan to Service Foods.  Pounders and Kantor made unauthorized, non-business related and personal payments to entities that were controlled in whole or in part by, or related to, Pounders and/or Kantor.

2.      Fraud Counts [Counts 11 – 13]

One of the conditions to funding the loan was that Kantor and Pounders submit a signed personal financial statement to First Tennessee. The personal financial statement required the disclosure of certain information, including the existence of any legal actions or judgments against them.  During the pendency of the loan, Pounders submitted five (5) personal financial disclosures, but failed to disclose numerous civil lawsuits that had been filed against him.  First Tennessee alleges that these were material omissions and that Pounders intentionally and deliberately concealed these legal actions and judgments "with the intent to deceive" First Tennessee.

First Tennessee also alleges that Pounders and Kantor significantly inflated the values of Service Foods' accounts receivable listed in the "Borrowing Base Certificates" that were submitted to First Tennessee.  First Tennessee alleges that Pounders and Kantor inflated the value of the receivables by over $10 million

dollars, and that they did so "in an intentional effort to deceive" First Tennessee.

C.  Deposition and Motion to Compel

On July 7, 2016, Plaintiff took the deposition of Stuart Kagan pursuant to a third-party subpoena.  *See* [Dkt. 234-2].  The deposition covered numerous topics, including Kagan's role at Service Foods, certain financial transactions of Service Foods, and knowledge of Pounders and Kantor with respect to those financial transactions.  Throughout the deposition, Kagan invoked his Fifth Amendment right against self-incrimination over 250 times and refused to answer questions covering most of the subject matters.

Arguing that Kagan does not have a reasonable basis to invoke his Fifth Amendment rights, Plaintiff filed this Motion to Compel seeking to compel answers from Kagan.  *See* [Dkt. 234].  As a result of First Tennessee's Motion, the Special Master held an *in camera* hearing on October 13, 2016, pursuant to the procedures articulated in *United States v. Goodwin*, 625 F.2d 693 (5th Cir. 1980), to allow Kagan to establish the basis to support his invocation of the Privilege against self-incrimination.  During the *in camera* hearing, Kagan and his counsel provided further background regarding, among other things, the extent of his involvement regarding the loan from Plaintiff, and why he fears incrimination as to certain questions that were posed to him. The Special Master received further

description regarding various potential witnesses and documents.

II.    LEGAL STANDARD

The Fifth Amendment of the U.S. Constitution declares in part that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.

Privilege against self-incrimination under the Fifth Amendment "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924).  Further, the guarantee against testimonial compulsion extends not only to "answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish *a link in the chain of evidence* needed to prosecute the claimant for a federal crime." *Hoffman v. U.S.*, 341 U.S. 479, 486 (1951) (citation omitted) (emphasis added).

A bald assertion of the privilege is insufficient to establish that the privilege applies.  *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980).  Rather, the Court must determine whether the person invoking the privilege has a "reasonable cause to apprehend danger from a direct answer."  *Id.* (citing *Hoffman,* 341 U.S. at 486).  More specifically:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive

> answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.  The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'

*Id*. at 486-87 (citation omitted).

While the witness need not prove the danger that he or she fears*, Goodwin,* 625 F.2d at 700, the witness or his counsel must provide more information to establish "real possibilities" of bases for criminal liability and not mere "hypothetical offerings" or conclusory statements. *See id.* at 701.   Further, although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions.  *Id.*

In other words, an individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a "testimonial" communication or act, and (3) incrimination.  *United States v. Ghidoni,* 732 F.2d 814, 816 (11th Cir. 1984).

Above all, the privilege must be sustained if it is not "perfectly clear, from a careful consideration of all the circumstances in this case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency" to incriminate.  *Hoffman*, 341 U.S. at 488 (citations omitted).

III.   DISCUSSION

Since Kagan is neither named as a defendant, nor directly mentioned in the Amended Complaint, First Tennessee challenges Kagan's ability to invoke his Fifth Amendment rights and, alternatively, argues that he be required to show that his invocation is justified on a question-by-question basis. *See* [Dkt. 234-4, at p. 6].

In order to determine whether Kagan has "reasonable cause" to fear incrimination, the Special Master first must determine whether Kagan is merely a witness (as Plaintiff asserts), or someone who has a "substantial and real hazard of self-incrimination," *United States v. Argomaniz*, 925 F.2d 1349, 1353 (11th Cir. 1991)(citation omitted).

a.  Kagan's involvement with Service Foods

Kagan received an accounting degree from Queens College and a master's degree in business education from New York University.  [Dkt. 234-2 at 23].  He began working for Service Foods in 1998.  *See* [*id.* at 27-28].  At a certain point in time from 1998 to 2012, Kagan became the Chief Financial Officer of Service Foods.  *See* [*id.*, Dkt. 146-2 at 19].[3]  Kagan worked with Laryssa Horak-Losh on a day-to-day basis, and would ask Horak-Losh to generate account aging reports.

_____

[3] Kagan refused to answer any questions about his employment history with Service Foods based on his Fifth Amendment rights.  However, Kagan's direct report, Laryssa Horak-Losh, provided some background details as to Kagan's position with Service Foods.  *See* [Dkt. 146-2].

[*Id*. at 63, 109].  Kagan had access to THEOS – Service Foods' accounting system – and on June 11, 2015, he sent to an employee of Plaintiff an email with Service Foods' aging and open receivables report as of April 30, 2015.  [*Id*. at 82-83, 119].  Kagan and Horak-Losh had conversations about particular customers.  *See* [*id*. at 100-101].  Horak-Losh testified that Kagan would have knowledge about Service Foods' accounting functions, such as, customers' accounts receivable balances, and payments received from those customers.  *See* [*id*. at p. 88].[4]

b.  Whether there is "reasonable cause" to fear incrimination

First Tennessee points out that Kagan does not have a basis to invoke his Fifth Amendment rights because his "claimed fear of prosecution based solely on his employment with Service Foods and First Tennessee's assertion of fraud claims against Service Foods is much too 'remote and speculative[.]'"  *See* [Dkt. 234-3 at 6-7].  In contrast, Kagan argues that the threat of prosecution is real in light of the allegations in the civil case against Service Foods, and that the Fifth Amendment protects him even if he maintains his innocence of wrongdoing.  [Dkt. 237 at 5].

Since Kagan is neither named as a defendant in the civil lawsuit nor is mentioned at all in the allegations, the Court must consider all of the circumstances

---

[4] During the *in camera* hearing, Kagan and his counsel proffered additional facts regarding his knowledge of the accounting functions of Service Foods and his involvement and knowledge, if any, regarding submission of information containing material misrepresentations to First Tennessee.

in the record to determine whether Kagan has "reasonable cause" to believe that he has potential criminal exposure.  As an initial matter, the Special Master finds that, if the allegations contained in the Amended Complaint are proven true, the facts may reasonably support a finding that Pounders and Kantor violated various federal and state criminal statutes, including, but not limited to, mail and wire fraud, bank fraud, and state criminal law of theft by conversion, O.C.G.A. §16-8-4. Plaintiff alleges that Pounders and Kantor, along with others, have misrepresented material facts to Plaintiff in order for the named defendants to obtain the loan and to continue to have access to the line of credit. Plaintiff further alleges that the misrepresentations were done with the "intent to deceive" the bank.  Moreover, Plaintiff alleges that its collateral for the loans – e.g., payments on the accounts receivable – were misappropriated and redirected to entities affiliated with Pounders and/or Kantor, such as H-Son.

It is also well established that an individual who knowingly and willfully assists another to commit bank or wire fraud can be criminally liable as an aider or abettor under 18 U.S.C. § 2, and/or as a co-conspirator under 18 U.S.C. §§ 371, 1349.  With respect to Kagan, the record shows that he was a long-time employee of Service Foods and had responsibility over the financial records of Service Foods – the very records that are alleged to have contained materially false information.

Indeed, there is evidence in the record to show that Kantor submitted at least one accounts receivable aging report to Plaintiff that may have contained material overstatements. There is also testimony provided by Horak-Losh that she took directions from Kagan with respect to customer invoicing information. Over the years, Kagan dealt with Pounders and Kantor with respect to Service Foods, and based on the questions posed, Plaintiff believes that Kantor dealt with the auditors and lawyers for Service Foods. Further, based on the questions referencing emails written by Kagan to First Tennessee's representatives, it is clear that the Plaintiff at least believes that Kagan should have known the contents of the attachments sent to First Tennessee. Based on these circumstances, the Special Master finds that it is reasonable for Kagan to believe that the government may impute to Kagan knowledge as to the inaccuracy of certain financial statements and records of Service Foods.

Moreover, the fact that Kagan maintains his innocence does not change the result. The Supreme Court has recognized that the Fifth Amendment protects even those not accused of wrong doing, since "truthful responses of an innocent witness . . . may provide the government with incriminating evidence from the speaker's own mouth." *Ohio v. Reiner*, 52 U.S. 17, 20 (2001) (citing *Grunewald*, 353 U.S. at 421-42) (upholding a Fifth Amendment assertion by a witness notwithstanding his

claim of innocence, because of witness's extended period of being with a defendant during the relevant timeframe of the crime).   Further, he may avail himself of Fifth Amendment protection if there is a possibility that he may be "ensnarled by ambiguous circumstances." *Grunewald v. United States*, 353 U.S. 391, 421 (1957) (citation omitted).

As an initial matter, the Special Master finds that the allegations and the evidence proffered in the case show a real possibility that Kagan has criminal liability as to some of the questions that were posed to him.  More specifically, a clear majority of the questions posed during the deposition related to Kagan's knowledge regarding, and role in creating, the accounts receivable aging reports and financial statements that were submitted to First Tennessee are potentially incriminating.   Considering Kagan's role as Chief Financial Officer of Service Foods in the context of Plaintiff's allegations against the named defendants, the Special Master finds that there is reasonable cause for Kagan to fear incrimination, since the answers would be directly related to whether Kagan knowingly and intentionally assisted the defendants in the alleged bank fraud scheme.

At the very least, given his position and proximity to the named defendants, the record shows "ambiguous circumstances" which may cause a prosecutor to view Kagan as a co-conspirator or an aider and abettor of Kantor, Pounders, or

Service Foods in their criminal activity.  Thus, the Special Master finds that any questions related to Kagan's knowledge regarding, and role related to, specific financial transactions between the corporate defendants may result in "injurious disclosure," and that Kagan has "reasonable cause" to fear incrimination.  *See, e.g., Reiner*, 52 U.S. at 20.

However, even if there are circumstances showing "reasonable cause" to fear incrimination as to some of the questions, Kagan cannot assert a blanket invocation of his Fifth Amendment rights and refuse to answer <u>all</u> questions posed during his deposition.  As noted before, while the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions.  *See Goodwin*, 625 F.2d at 701.  Questions posed to Kagan that do not necessarily relate to either the financial transactions involving Service Foods or the financial condition of Service Foods require further discussion.  *See e.g., United States v. Roundtree*, 420 F.2d 845, 852 (5th Cir. 1969) (rejecting a blanket assertion of the right against self-incrimination and requiring the witness to answer or raise his Fifth Amendment rights to each question posed).

1.  Areas of inquiry that may not be reasonably "incriminating"

a.  Employment with Service Foods [Dkt. 234-2, pps. 32:5-36:11]

After a careful review of the deposition transcripts and the record, the

Special Master finds that Kagan's assertion of his Fifth Amendment privilege regarding any and all questions related to his alleged employment at Service Foods is overly broad.  For example, it is unreasonable to believe that questions such as "you were the CFO of Service Foods from 1998 through July 2015?" [Dkt. 234-2, p. 32] would result in an injurious disclosure.  While answering such a question (which cannot be seriously contested) may affirm that Kagan worked at Service Foods in various capacities, including as the CFO, it is too tenuous to support a reasonable fear of incrimination by Kagan.  Similarly, it is unreasonable to believe that questions related to Kagan's office location, his general responsibility at Service Foods, or whether he had a written contract of employment are incriminating.  *See* [*id.*]  Answers to these general questions simply do not provide any details as to Kagan's state of mind or actions taken with respect to the allegations of criminal conduct.

Therefore, the Special Master recommends that Kagan be compelled to answer the following questions posed that relate to Kagan's employment history and job description:

- Page 32:5 through Page 33:25 (questions relating to employment history and duties of Kagan and Horak-Losh); and

- Page 34:18 through Page 35:8 (questions related to Pounders and Kantor's role with Service Foods and Southern Division).

Based on review of the record, the remaining questions in this portion of the deposition relate to Kagan's specific knowledge of and/or involvement in the financial transactions of Service Foods. Thus, the Special Master finds that the answers to these questions tend to incriminate Kagan and recommends that the Motion to Compel should be denied as to the questions not specified in the Report and Recommendation.

b. Role of Third-Party Servicers

First Tennessee also posed several questions to Kagan regarding services provided by third party service providers. Kagan refused to answer all questions posed on this topic. For example, Kagan raised his Fifth Amendment rights and refused to answer questions related to CPAs and attorneys who allegedly provided services to Service Foods, Kantor, or Pounders. *See* [Dkt. 234-2 at pp. 36:12 – 36:16, 37:4 – 37:6]. After considering the record and the proffered facts provided by Mr. Kagan during the *in camera* hearing, the Special Master finds that it is unreasonable to believe that answering the following questions that relate to third-party service providers would tend to incriminate Kagan:

- Page 36:12 – 36:16 and Pages 36:25 – 37:3 (questions related to CPAs who purportedly provided audit services);

- Page 37:4 to Page 38:13 (questions related to lawyer services used

by Pounders and Kantor);

- Pages 86:16 to 88:15 (questions related to CPAs and law firms used).

As such, the Special Master recommends that the Motion to Compel be granted as to these questions and that Kagan be ordered to provide answers. The Motion to Compel as to the remaining questions on this topic should be denied.

    c. Information regarding Service Foods and defendants Kantor and Pounders

Kagan also refused to answer questions regarding general background information regarding Service Foods Southern Division, LLC. For example, Kagan raises his Fifth Amendment rights in refusing to answer questions such as:

> Q: Let's talk for a few moments about Service Foods Southern Division, LLC. This is a company that was acquired by Service Foods, Inc. in 2007, correct?
> A:    Fifth Amendment.
> Q:    The owners – or the members of this LLC are Trey Pounders, Keith Kantor, and Mike Cohen?
> A:    Fifth Amendment.
>
> . . .
>
> Q:    Turning to H-Son Financial, Inc., this is a third company that Mr. Pounders and Mr. Kantor jointly owned, correct?
> A:    Fifth Amendment.

[Dkt. 234-2, p. 38:17 to 38:24; 39:14 to 39:17].

None of these questions appear to be directed at Kagan's activity that can be

reasonably viewed as incriminating.   Indeed, the questions are designed to seek information about the relationship between the Defendant companies and Pounders and Kantor, and not the relationship between these entities/individuals and Kagan. As such, the Special Master finds that general questions related to Service Foods, the other corporate defendants, and the roles Pounders and Kantor played in those entities (as opposed to those specifically directed at Kagan) are not incriminating to Kagan.   As such, Kagan should answer the questions posed at the following pages:

- Page 38:17 to Page 39:20 (Roles of Kantor and Pounders in certain defendant corporations);

- Page 40:3 to 40:14 (Kantor's and Pounders' access to business records);

- Page 42:15 to 42:17 (Where Ellsworth Foods, Inc. is located);

- Page 43:6 to 43:18, 43:23 to 44:21 (Jefferson Financial's role);

- Page 44:22 to 44:24 (when the date fiscal year ended for corporate defendants).

  d.  Checks, Loan Documents, and Signatures of Kantor and Pounders

Kagan also raised his Fifth Amendment rights and refused to answer numerous questions seeking to verify that certain loan documents were executed in the name of Service Foods, that certain company checks were issued, and that

Pounders' or Kantor's signatures were on those documents. *See* [Dkt. 234-2, pp. 46:12 to 140:16]. The record is devoid of any facts to suggest that verifying the signatures of the named defendants would provide "reasonable cause" to believe the answers would incriminate Kagan.[5] As such, Kagan is directed to answer the questions posed on the following pages of the deposition transcript:

- Page 46:12 to Page 46:24 (questions related to payee on the checks and the person who signed the check);

- Page 47:10 to Page 48:2 (questions related to payee on the checks and the person who signed the check);

- Page 48:15 to Page 49:16 (questions related to payee on the checks and the person who signed the check);

- Page 49:23 to Page 50:1 (questions related to payee on the checks and the person who signed the check);

- Page 50:7 to Page 51:15 (questions related to payee on the checks and the person who signed the check);

- Page 52:8 to Page 52:18 (location of original checks);

- Page 52:23 to Page 53:14 (signature of loan agreement);

- Page 54:14 to Page 55:16 (signature on promissory note and

---

[5] First Tennessee did not attach copies of checks [Deposition Exhibits 163, 166, 178-179] or documents [Deposition Exhibits 181-191] that it showed to Kagan during the deposition. Nevertheless, the context and circumstances surrounding the questions can be derived from the questions themselves. Kagan has failed to provide sufficient explanation as to why answering questions related to Pounders' or Kantor's signatures would be incriminating to him.

security agreement);

- Page 56:9 to Page 57:3 (signature on loan amendment);

- Page 57:12 to Page 57:21 (signature on promissory note);

- Page 58:4 to Page 58:16 (signature on amendment to security agreement);

- Page 58:20 to Page 59:16 (signature on security agreement);

- Page 60:1 to Page 60:16 (signature on a guaranty);

- Page 61:1 to Page 62:18 (signatures on various guaranties);

- Page 62:21 to Page 63:15 (signatures on loan amendment);

- Page 63:24 to Page 64:9 (signature on security agreement);

- Page 64:18 to Page 65:20 (signatures on restated promissory note and amendment to security agreement);

- Page 66:4 to Page 66:13 (signature on amendment to loan agreement);

- Page 66:14 to Page 67:4 (status of the loans);

- Page 139:17 to Page 140:16 (signature on loans).

e. Questions related to Kantor's Resignation Letter [Deposition Exhibit 212]

Questions regarding Exhibit 212 are related to a purported resignation letter written by Kantor. Plaintiff asked Kagan about Kantor's signature on the letter, and health problems that were referenced in the letter. After reviewing the record,

the Special Master finds that it is unreasonable to believe that answers to these questions would incriminate Kagan.  As such, Kagan should be ordered to provide answers to the following questions:

- Page 67:20 to Page 68:20 (questions related to Kantor's resignation letter and his health);

- Page 68:24 to 69:9 (Questions related to a P.O. Box and who had access to it);

- Page 84:10 to 84:13 (Whether Pounders worked for Ellsworth Foods).

    f.  Letter from John Christy [Deposition Exhibit 97]

Kagan raises his Fifth Amendment rights and refuses to answer questions related to a letter written by John Christy, a lawyer who allegedly provided legal services to Pounders and Kantor:

> Q: (by Mr. Stine) This [Exhibit 97] is a letter dated June 24th, 2015, from a lawyer named John Christy, correct?
> A: Fifth Amendment
> Q:  You recognize Mr. Christy as a lawyer who provided legal services from time to time to Harold Pounders and Keith Kantor, Correct?
> A:  Fifth Amendment.

[Dkt. 234-2, p. 81:7 – 81:14].  After considering the record, the Special Master finds that it is unreasonable to believe that answering these two questions would incriminate Kagan. The questions do not probe whether Kagan had any conversations with Christy, what, if anything, they discussed, and whether Kagan

has any knowledge regarding the contents of the letter.  Nothing in the record nor the facts proffered during the *in camera* hearing shows that there is reasonable cause to believe that answers to these questions would be incriminating. Thus, Kagan should answer these two questions.

g.  Keith Kantor's Background

Kagan raised his Fifth Amendment rights and refused to answer questions relating to Kantor's background. For example, he refused to answer a question regarding whether Kantor was a medical doctor or whether Kagan knew of Kantor's criminal history.  Kagan offered no reasonable basis upon which to find that answers to these questions would tend to incriminate him.  As such, based on the record, the Special Master recommends that Kagan be compelled to answer the questions posed on the following section of the deposition transcripts:

- Page 145:8 to 145:25 (related to Kantor's background)

2.  Subject Matter Waiver

As additional grounds to justify a broad assertion of the Fifth Amendment privilege, Kagan raises a concern that answering even one question on a certain topic would result in a subject matter waiver of the privilege as to that topic. Kagan, however, cites no authority to support his argument that the fear of subject matter waiver justifies the assertion of the Fifth Amendment privilege to every

question that is posed on a particular topic.  While a witness can waive his Fifth Amendment privilege, the waiver must be knowingly and voluntarily done, and is not "to be easily inferred."  *Emspak v. United States*, 349 U.S. 190, 196-98 (1955)(the court must "indulge every reasonable presumption against waiver of fundamental constitutional rights.")(citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)).  Since the Court is compelling Kagan to answer the questions listed above, Kagan is neither voluntarily waiving his rights as to other questions posed on the particular subject matter, nor should the parties infer that he has done so.[6]

## IV.   CONCLUSION

As described more fully above, the Special Master recommends that Plaintiff First Tennessee's Motion to Compel Non-Party Stuart Kagan to Answer Questions in Continued Deposition [Dkt. 234] be GRANTED in part, and DENIED in part.

This 29th day of September, 2017.


 *S/ Byung J. Pak*
BYUNG J. "BJAY" PAK
SPECIAL MASTER

---

[6] If Plaintiff seeks to depose Kagan again to get answers to the questions listed in this Report and Recommendation, there is a possibility that certain follow-up questions may be asked.  Since the Special Master can neither predict what those questions would be, nor whether those questions fall within Kagan's Fifth Amendment rights, no specific recommendations or rulings can be provided at this time.

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

This will certify that the foregoing pleading was prepared using Times New Roman 14pt Font, and that I have this day filed the foregoing using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

| | |
|---|---|
| Kevin A. Stine<br>Kathleen G. Furr<br>Brett A. Switzer<br>**Baker, Donelson, Bearman,**<br>**Caldwell & Berkowitz, PC**<br>Suite 1600, Monarch Plaza<br>3414 Peachtree Street, NE<br>Atlanta, GA 30326<br>kstine@bakerdonelson.com<br>kfurr@bakerdonelson.com<br>bswitzer@bakerdonelson.com | Richard B. Gossett<br>**Baker, Donelson, Bearman, Caldwell**<br>**& Berkowitz, PC**<br>633 Chestnut Street<br>Chattanooga, TN 37450<br>rgossett@bakerdonelson.com |
| Ryan A. Kurtz,<br>**Miller & Martin, PLLC**<br>Suite 2100<br>1180 West Peachtree Street, NW<br>Atlanta, GA 30309<br>rkurtz@millermartin.com | Elizabeth B. Hodges<br>Brent W. Herrin<br>Garrett H. Nye<br>Gustav H. Small, Jr.<br>**Cohen Pollock Merlin & Small**<br>3350 Riverwood Pkwy, Suite 1600<br>Atlanta, GA 30339<br>ehodges@cpmas.com<br>bherrin@cpmas.com<br>gnye@cpmas.com<br>gsmall@cpmas.com |

| | |
|---|---|
| Todd E. Hatcher<br>H. Scott Gregory, Jr.<br>**Gregory, Doyle, Calhoun & Rogers, LLC**<br>49 Atlanta Street<br>Marietta, GA 30060<br>thatcher@gregorydoylefirm.com<br>sgregory@gregorydoylefirm.com | Brian Steel<br>**The Steel Law Firm**<br>1800 Peachtree Street, NW<br>Suite 300<br>Atlanta, GA 30309<br>thesteellawfirm@msn.com |
| Walt Britt<br>**Chandler, Britt & Jay LLC**<br>4350 South Lee Street<br>Buford, Georgia 30518<br>wbritt@cbjblawfirm.com | Charles Edgar Hoffecker<br>**Ney Hoffecker Peacock & Hayle LLC**<br>1360 Peachtree Street, NE<br>One Midtown Plaza, Suite 1010<br>Atlanta, GA 30309<br>chad@nhelaw.com |

Dated: September 29, 2017.


 *S/ Byung J. Pak*_____
BYUNG J. "BJAY" PAK