## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **FIRST TENNESSEE BANK** | ) | |
| **NATIONAL ASSOCIATION,** | ) | |
| | ) | **CIVIL ACTION** |
| **PLAINTIFF,** | ) | |
| | ) | **NO. 1:15-CV-2940-CAP** |
| **v.** | ) | |
| | ) | |
| **SERVICE FOODS INC., ET AL.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO COMPEL NON-PARTY MICHAEL COHEN TO ANSWER QUESTIONS IN CONTINUED DEPOSITION [DKT. 248]

The Special Master, Byung J. "BJay" Pak of Chalmers Pak Burch & Adams LLC, hereby files this Report and Recommendation on Plaintiff First Tennessee Bank's ("First Tennessee" or "Plaintiff") Motion to Compel Non-Party Michael Cohen To Answer Questions in Continued Deposition [Dkt. 248].

For the reasons stated below, the Special Master recommends that the Motion be granted.

I.    BACKGROUND

A.  Claims in the Complaint

On August 19, 2015, Plaintiff First Tennessee brought this lawsuit against

Defendants Service Foods Inc. d/b/a Blue Ribbon Foods ("Service Foods"), Southern Division LLC, d//b/a/ Southern Foods ("Southern Division"), H-Son Financial Inc. d/b/a Jefferson Financial ("H-Son") and Harold T. Pounders ("Pounders") and Keith Kantor ("Kantor") alleging various claims ranging from breach of a loan agreement and related guarantees to conversion.   Dkt. 1.   The Plaintiff filed a First Amended and Restated Complaint on September 23, 2015 alleging the following specific counts:

Count I:  Suit on a Note against Service Foods;

Count II:  Enforcement of Guaranty Agreement against Southern Division;

Count III: Enforcement of Guaranty Agreement against H-Son;

Count IV: Enforcement of Guaranty Agreement against Pounders;

Count V:  Enforcement of Guaranty Agreement against Kantor;

Count VI:  Conversion claim against Pounders related to Whitebridge Financial;

Count VII:  Conversion claim against Kantor related to Whitebridge Financial;

Count VIII:  Conversion claim against Pounders related to Equitable Acceptance Corporation;

Count IX: Conversion claim against Kantor related to Equitable Acceptance

Corporation;

Count X:  Conversion claim against Pounders and Kantor for misappropriation of funds;

Count XI:  Fraud claim against Kantor related to his personal financial statements;

Count XII:  Fraud claim against Pounders related to his personal financial statements;

Count XIII:  Fraud claim against Pounders and Kantor related to Service Foods's accounts receivable;

Count XIV: Breach of fiduciary duty claim against Pounders and Kantor;

Count XV:  A claim for punitive damages against Pounders; and

Count XVI: A claim for punitive damages against Kantor.

Defendants Kantor and Pounders filed an Answer on October 15, 2015 and January 12, 2016, respectively. *See* Dkts. 21; 49.  There is an entry of default against the remaining defendants.

B.  Relevant Factual Allegations[1]

On or about November 30, 2006, Service Foods entered into a loan transaction with First Tennessee, whereby First Tennessee agreed to make

---

[1] For the limited purposes of issuing a Report and Recommendation, the factual allegations contained in the Amended Complaint will be considered as true.

advances on a revolving credit basis up to $6.5 million dollars ("Loan Agreement"). In connection with the Loan Agreement, Pounders, Kantor and H-Son signed as guarantors of the Loan Agreement. Pounders and Kantor were shareholders of Services Foods and H-Son. Service Foods also granted a first-priority security interest as collateral in certain assets of Service Foods, including, but not limited to, any and all accounts, accounts receivable, notes receivable, contract rights, and other proceeds of any kind.

The terms of the Loan Agreement were extended many times, and the credit was ultimately increased to $10.25 million through a series of Amendments to the Loan Agreement. Importantly, in September 2007, Southern Division was added as a guarantor of the Loan Agreement. Kantor is a member of Southern Division, and was involved in the day-to-day management of Southern Division. Pounders is believed to be a principal of Southern Division.

As a part of Southern Division's guarantee, it granted a first-priority security interest in certain assets of Southern Division, including, but not limited to, any and all accounts, accounts receivable, notes receivable, contract rights, and other proceeds of any kind. As of July 28, 2015, the principal balance of $10.25 million was outstanding, along with over $590,000 in additional principal as funded overdrafts and interest. Service Foods and Pounders, Kantor, and H-Son allegedly

have not repaid any of the amounts due, and are in default of the Loan Agreement and the related amendments and guarantees.

While the First Amended Complaint contains numerous counts, only the allegations surrounding Counts 6-13 are most relevant to the Motion under consideration and warrant further discussion.

1.     Conversion and Diverted Funds Allegations [Counts 6 – 10]

In June of 2015, Whitebridge Financial LLC ("Whitebridge") agreed to purchase from Service Foods and Southern Division certain customer accounts and contracts to which First Tennessee claims a first-priority security interest. Pounders, who is believed to be a principal of Service Foods and Southern Division, managed the sale of the customer accounts and contracts to Whitebridge. The proceeds of the sale were supposed to be sent to First Tennessee, pursuant to a pre-existing intercreditor agreement between Whitebridge and First Tennessee. Despite knowing the existence of the intercreditor agreement between Whitebridge and First Tennessee, Pounders and Kantor allegedly directed Whitebridge to send the sales proceeds in the amount of $58,524.62 to a Bank of North Georgia Account in the name of H-Son – an account over which Pounders and Kantor had exclusive control.  According to Plaintiff, Pounders and Kantor have so far refused to account for or remit the sales proceeds.

Similarly, First Tennessee alleges that, from February 1, 2015 to approximately June 30, 2015, Service Foods sold its accounts and related contracts to Equitable Acceptance Corporation ("EAC").   EAC paid $485,180.73 for the accounts.   Pounders and Kantor allegedly directed Service Foods to deposit the proceeds into the Bank of North Georgia Account in the name of H-Son.  Pounders and Kantor have so far refused to account for or remit the sales proceeds.

First Tennessee also alleges that Pounders and Kantor misappropriated funds that served as collateral for its loan to Service Foods.  Pounders and Kantor made unauthorized, non-business related and personal payments to entities that were controlled in whole or in part by, or related to, Pounders and/or Kantor.

2.    Fraud Counts [Counts 11 – 13]

One of the conditions to funding the loan was that Kantor and Pounders submit a signed personal financial statement to First Tennessee.   The personal financial statement required the disclosure of certain information, including the existence of any legal actions or judgments against them.  During the pendency of the loan, Pounders submitted five (5) personal financial disclosures, but failed to disclose numerous civil lawsuits that had been filed against him.  First Tennessee alleges that these were material omissions and that Pounders intentionally and deliberately concealed these legal actions and judgments "with the intent to

deceive" First Tennessee.

First Tennessee also alleges that Pounders and Kantor significantly inflated the value of Service Foods' accounts receivable listed in the "Borrowing Base Certificates" that were submitted to First Tennessee.  First Tennessee alleges that Pounders and Kantor inflated the value of the receivables by over $10 million dollars, and that they did so "in an intentional effort to deceive" First Tennessee.

C.  Deposition and Motion to Compel

On August 17, 2016, Plaintiff took the deposition of Michael Cohen – a non-party. During the deposition, Cohen asserted his Fifth Amendment rights to hundreds of questions despite stating that "I do not believe I have violated the law." Dkt. 248-2 at p. 18 [Deposition transcript of Michael Cohen].  In general, Cohen raised his Fifth Amendment rights to any and all questions related to his knowledge or involvement regarding the Defendant companies, any affiliated companies, and his interactions with Pounders and Kantor.  Plaintiff challenges the scope of his  assertions arguing, *inter alia*, that Cohen lacks "reasonable cause" to believe his responses have a tendency to incriminate him.  Dkt. 248-3 at pp. 7-8.

On November 2, 2016, the Special Master held an *in camera* hearing pursuant to the procedures articulated in *United States v. Goodwin*, 625 F.2d 693 (5th Cir. 1980) in order to allow Cohen to establish the basis to support his

invocation of the Privilege against self-incrimination as to the deposition questions.[2]  During the *in camera* hearing, Cohen and his counsel provided further description of the extent and circumstances of his involvement and knowledge with respect to the loan from Plaintiff vis-à-vis the allegations contained in the Amended Complaint.

## II.   LEGAL STANDARD

The Fifth Amendment of the U.S. Constitution declares in part that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.

Privilege against self-incrimination under the Fifth Amendment "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924).  Further, the guarantee against testimonial compulsion extends not only to "answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish *a link in the chain of evidence* needed to prosecute the claimant for a federal crime."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (citation omitted) (emphasis added).

---

[2] In light of the number of questions involved in the Motion, the parties were asked to confer in good faith to determine whether they could limit the number of questions at issue.  After conferring, the parties reported that they could not agree on any of the questions.

A bald assertion of the privilege is insufficient to establish that the privilege applies. *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980). Rather, the Court must determine whether the person invoking the privilege has a "reasonable cause to apprehend danger from a direct answer." *Id*. (citing *Hoffman,* 341 U.S. at 486). More specifically:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'

*Id*. at 486-87 (citation omitted).

While the witness need not prove the danger that he or she fears*, Goodwin*, 625 F.2d at 700, the witness or his counsel must provide more information to establish "real possibilities" of bases for criminal liability and not mere "hypothetical offerings" or conclusory statements. *See id.* at 701. Further, although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. *Id.*

In other words, an individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a "testimonial" communication or act, and (3) incrimination. *United States v. Ghidoni,* 732 F.2d 814, 816 (11th Cir.

1984).

Above all, the privilege must be sustained if it is not "'perfectly clear, from a careful consideration of all the circumstances in this case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency'" to incriminate. *Hoffman*, 341 U.S. at 488 (citations omitted).

III.   DISCUSSION

Cohen's deposition covered a variety of subject matters related to Service Foods, such as the signatories on various Loan Documents, the status of the loan, and various financial transactions involving Service Foods and those entities believed to be affiliated with Kantor and Pounders.   Generally speaking, Cohen raised his Fifth Amendment right against self-incrimination as to questions even remotely related to his relationship with any of the Defendants.

a.  Cohen's involvement with the defendants[3]

In 2006 or 2007, Cohen allegedly became a minority owner in defendant Service Foods Southern Division. While not a direct employee of Southern Division, Cohen also provided marketing services to Southern Division as a consultant through an entity called Claricy.  Cohen provided these services on a

---

[3] The facts are derived from the allegations made by Plaintiffs in various pleadings and documents submitted by the parties.  The Special Master assumes these facts to be true for the purposes of ruling on the Motion to Compel.

day-to-day basis until about July of 2015, when Cohen began consulting for Ellsworth Foods.  He continues to provide marketing services to Ellsworth Foods to this date.

From 2013 to 2015, Cohen worked out of the Chamblee office of Southern Foods, where he interacted with Pounders regularly.  He had only limited contacts with Kantor.  Despite being a minority owner, Cohen was not involved in the accounting side of operations, and was not part of the presentation of the receivables that were made to the Plaintiffs.

b.  Scope of Cohen's Fifth Amendment Invocation

1.  Whether Cohen has "reasonable cause" to fear incrimination

As an initial matter, the Special Master finds that if the allegations contained in the Amended Complaint are proven true, the facts may reasonably support a finding that Pounders and Kantor violated various federal and state criminal statutes, including, but not limited to, mail and wire fraud, bank fraud, and state criminal law of theft by conversion, O.C.G.A. § 16-8-4.  Plaintiff alleges that Pounders and Kantor, along with others, have misrepresented material facts to Plaintiff in order for the named defendants to obtain the loan and to continue to have access to the line of credit. Plaintiff further alleges that the misrepresentations were done with the "intent to deceive" the bank.  Moreover, Plaintiff alleges that

its collateral for the loans – e.g., payments on the accounts receivable – were misappropriated and redirected to entities affiliated with Pounders and/or Kantor, such as H-Son.

An individual who knowingly and willfully assists another to commit bank or wire fraud can be criminally liable as an aider or abettor under 18 U.S.C. § 2, and/or as a co-conspirator under 18 U.S.C. §§ 371, 1349.  As such, even if there are no allegations of wrongdoing directly against a witness, he may, nevertheless, be able to assert his Fifth Amendment rights against self-incrimination *if* there is a possibility that he may be "ensnarled by ambiguous circumstances." *Grunewald v. United States*, 353 U.S. 391, 421 (1957) (citation omitted).  Indeed, the Supreme Court has recognized that the Fifth Amendment protects even those not accused of wrongdoing, since "truthful responses of an innocent witness . . . may provide the government with incriminating evidence from the speaker's own mouth." *Ohio v. Reiner*, 52 U.S. 17, 20 (2001) (citing *Grunewald*, 353 U.S. at 421-42).

Cohen is neither named as a defendant in this case, nor is he directly mentioned in the Amended Complaint filed by First Tennessee.  Further, he affirmatively denies any criminal wrongdoing:

> While I would very much like to answer the bank's questions today, I have been advised by my counsel to assert my constitutional right not to testify or answer any questions related to the subject matter of this deposition.

> I do not believe I have violated the law. However, as the United States Supreme Court has provided the Fifth Amendment intended to protect the innocent which is the exact position I find myself in today.
>
> After very careful consideration, I've decided to follow my counsel's advice not to answer any of the questions today. I reserve my right to reconsider my apposition as new information and developments come to light.

Dkt. 248-2 at pp. 18-19.

Cohen has not been questioned by any criminal authorities in connection with his involvement in Service Foods. *See* Dkt. 248-2, p. 39. To justify his invocation of his Fifth Amendment rights in light of his claim of innocence, Cohen relies heavily on Plaintiff's assertion that he has some liability to Plaintiff. Cohen also relies on the content of a letter written by Plaintiff's counsel to Cohen's counsel dated September 22, 2016 – approximately one month after Cohen's deposition. *See* September 22, 2016 letter to Ryan Kurtz, attached hereto as Appendix 1 ("Demand Letter"). In the letter, in which the Plaintiff's counsel raises potential settlement terms, Plaintiff outlines its understanding of Mr. Cohen's role vis-à-vis the loan proceeds:

> Mr. Cohen may not have personally guaranteed the Service Foods loan or submitted false financial information to the [Plaintiff], but he played a central role within Service Foods organization since 2009. He is a minority owner Service Foods Southern Division, LLC, and he was directly involved in Trey Pounders' succession planning that resulted in continuation of operations through Ellsworth Foods, Inc. and newly organized Ellsworth Foods, LLC. He knew the Bank had not given consent to the transfer of assets and operations to Ellsworth

Foods, Inc., or subsequent transfer of those same assets and operations to Ellsworth Foods, LLC. He knew Ellsworth Foods entities generated re-orders from legacy Service Foods/Service Foods Southern Division customers based on customer data and systems that had been pledged as collateral to the Bank. He likely knew his colleagues were supplying false information to the Bank for years, considering the Bank's credit line was dependent on the borrowing base and remained in excess of $10 million even though actual receivables were less than $2 million.

Demand Letter at 2.

Plaintiff also attached several diagrams purportedly showing Cohen's indirect ownership interests in nine different entities that received funds from Service Foods: Clarisy Group, International Boulevard Partners, LLC; KIG Trust; KMT Ventures; KMT Group; Midtown Imports, LLC; North Peachtree Partners, LLC; Royal Parkway Partners; and Trinity Consulting. *Id.* In sum, Plaintiff alleges in the Demand Letter that Cohen "indirectly received and directly benefited from disbursements by Service Foods and Service Foods Southern Division totaling over $4.9 million dollars between 2011 to 2015." *Id.*

These assertions, if true, show that Cohen may have known about the activities of Pounders and Kantor, and that Cohen benefited indirectly through his alleged ownership interests in the affiliate companies. The allegations fall short of establishing that Cohen knowingly and intentionally assisted Pounders and Kantor in the alleged criminal actions, however.

Regardless, since Cohen worked for Southern Foods for an extended period of time and had interacted on a regular basis with at least one of the defendants who allegedly committed a fraud, the Special Master cannot completely rule out the possibility that Cohen might be "ensnarled by ambiguous circumstances."  As such, an examination of the specific questions is necessary to determine whether Cohen properly raised his Fifth Amendment privilege.

c.  Areas of Inquiry

1.  Names of Corporations

Cohen testified during the deposition that he began a marketing consulting firm sometime after 2004. However, Cohen pleaded the Fifth Amendment and refused to give the name of the consulting firm. *See* Dkt. 248-2, at p. 33:13-15. When asked what other companies Cohen had incorporated since 2006, and what the names of those entities were, Cohen also pleaded the Fifth Amendment and refused to answer the question. *See id.*, at pp. 34:23 to 35:8.

Cohen claims that these questions elicit potentially incriminating testimony because some of the entities are listed in the Demand Letter, and that Plaintiff has alleged that those entities received funds that flowed from Pounders' and Kantor's alleged activities.  Other than this argument, Cohen proffered no additional facts to explain his fear of incrimination.

Based on the record, the Special Master finds that the questions do not elicit answers that are potentially incriminating to Cohen, and that there is no reasonable cause to believe that naming the companies is incriminating.  There is nothing in the record to infer that Cohen incorporated these entities for the purposes of furthering Pounders' and Kantor's alleged fraud, or that these entities received funds with the knowledge that the funds were indeed fraudulently obtained. Further, other than the allegation that the loan proceeds flowed to the corporate *entities* listed in the Demand Letter, Cohen failed to explain how that fact would be incriminating as to him *individually*.  Thus, the Special Master does not see a "link in any chain" of evidence that would support a reasonable fear of incrimination. Cohen should answer these questions.

2.     Ownership Interest in Service Foods

Cohen refused to answer whether he was ever an owner of Service Foods or whether he was ever a shareholder of Service Foods.  *See e.g.,* Dkt. 248-2, pp. 36:20-23; 37:3-5.   Assuming Cohen was an owner or a shareholder of Service Foods, there is nothing in the record to support a reasonable belief that answering these questions would incriminate Cohen.  Plaintiff does not allege that Cohen lied to the bank or that he helped Pounders or Kantor to do so. Further, during the *in camera* hearing, Cohen did not provide any additional facts regarding how else he

might be connected to the activities of Pounders or Kantor to support a finding that his fear is reasonable.  There is no evidence, or even an allegation, that Cohen willingly participated in the alleged conspiracy, or that he knew that false information was being submitted to the Plaintiff.  As a matter of fact, information proffered by Cohen during the *in camera* hearing as to his knowledge indicates to the contrary – e.g., he handled marketing and not the accounting operations of Service Foods.

Therefore, Cohen should answer these questions.

3.    General Questions Regarding the Defendants and Affiliated Parties

Cohen refused to answer any questions that were related to the named Defendants and his relationship with them.  For example, Cohen refused to answer any questions about: 1) when and how he met Pounders and Kantor, 2) Cohen's duties, 3) names of employees, members, directors or shareholders of the corporate Defendants in the case, 4) the relationship between the named Defendants, 5) any other trade names used by the Defendants, and 6) where the corporate defendants maintained a bank account.  *See, e.g.,* Dkt. 248-2, at pp. 40 to 48:16.

Cohen argues that he can refuse to answer these questions because answering these questions would place Cohen in the proximity of those who are alleged to have committed a fraud.  Further, Cohen states that, since he had

knowledge of the inner workings of Service Foods, answering these questions would potentially implicate him in the fraud.

There is nothing in the factual record to sufficiently show why Cohen should reasonably fear incrimination by answering these questions.  While it cannot be disputed that he knew the Defendants, Cohen failed to establish during the *in camera* hearing what he actually knew, and why his knowledge would incriminate him.  He never proffered any facts demonstrating what his knowledge of "inner workings" entails.  For example, Cohen does not specify whether his knowledge of "inner workings" includes the financial information related to Service Foods or the financial transactions involving the Loan proceeds.  He does not specify how and when he obtained the knowledge vis-à-vis the alleged fraud in the case.  Moreover, to the extent he provided any "facts" during the *in camera* hearing, the record shows that Cohen was not involved in the financial aspects of the business and had no knowledge as to the falsity in the submissions to the bank.  Instead of providing specific facts showing why he personally fears incrimination, he provided mere speculation as to what a hypothetical aggressive prosecutor may decide in light of his proximity to the Defendants.  This is insufficient to find that there is a risk of incrimination.

Additionally, even if one assumes that there is a risk of incrimination, the

Special Master finds that Cohen's fear would not be "reasonable" in light of the highly speculative nature of his potential criminal exposure. There is simply no evidence in the record that Cohen is a target of a criminal investigation. The Amended Complaint does not name Cohen. The allegations contained in the Demand Letter, even proven to be true, may be sufficient to state an actionable civil claim for a voidable transfer, but are insufficient to establish that Cohen committed a crime or that he should reasonably fear incrimination.

As such, Cohen should be compelled to answer these questions.

### 4.    Cohen's Knowledge Regarding the Loan Terms

Plaintiff asked Cohen a series of questions related to whether he was aware of the existence of the loan, the various terms of the loan, and circumstances surrounding the servicing of the loan. *See* Dkt. 248-2, at pp. 50:11 to 52:12. Cohen refused to answer these questions stating that an answer would somehow furnish a "link in the chain of evidence" for a criminal charge.

The Special Master finds that the answers would not be incriminating to Cohen. Contrary to Cohen's belief that mere knowledge of the existence of the loan justifies his Fifth Amendment invocation, the record is devoid of facts that would permit the Special Master to evaluate whether mere acknowledgement would be incriminating to Cohen. Cohen is not a signatory to any of the loan

documents in this case. There are no facts (or even allegations) in the record to show that Cohen participated in the fraud, or that he had assisted the Defendants in submitting false information to the Plaintiff.  During the *in camera* hearing, Cohen declined to provide any facts to show th extent of his knowledge about the terms of the loan, how the loan was being serviced by Service Foods, and more importantly, how his knowledge was linked to the alleged crime.[4]

Based on this record, the Special Master cannot find that Cohen has a reasonable cause to fear incrimination when answering these questions.   The Motion to Compel should be granted as to these questions.

5.   Services of Rollins & Van Lear

Rollins & Van Lear is an accounting firm that provided certain professional services to Defendants.  *See* Dkt. 248-2, p. 52.  When Cohen was asked whether

---

[4] Cohen's counsel argues that his acknowledgment of his knowledge is a "link in the chain" of evidence that can be used to prosecute Cohen.  This argument should be rejected for several reasons.  First, despite providing him an opportunity to establish a record, Cohen failed to provide a factual background to show the actual "link" to a *crime* that Cohen committed.  Nothing that has been presented can be reasonably viewed as Cohen having criminal exposure.  Second, since he provided no factual details as to what the actual answers to the questions posed would have been, the Special Master cannot find that any of the questions would elicit an incriminating response.  Third, since any relevant fact can theoretically be a "link in the chain of evidence," Cohen should have provided a factual record so the Special Master could evaluate whether the "link" was sufficiently a strong one, or one that is too speculative or remote.  Based on the current record, possibility of incrimination is too remote.

this firm provided tax consulting or accounting services for him, Service Foods, Southern Division, Jefferson Financial, or Trinity Consulting, Cohen refused to answer citing his Fifth Amendment rights.  *See* Dkt. 248-2, pp. 53:16 to 54:3.

During the *in camera* hearing, Cohen explained that he was invoking his Fifth Amendment rights as to these questions because the answers would place him in the proximity to any audits that may have been conducted.

There is nothing in the record to suggest that the answers to these questions would incriminate Cohen. The questions seek to confirm whether the accounting firm did any work for Cohen or the Defendants. Even assuming that the accounting firm did work for Cohen, there is nothing in the record to show that this fact would somehow incriminate Cohen. Indeed, Cohen even proffered facts that show that he may not have known what work might have been performed by the accounting firm.

Based on these reasons, the Special Master finds that Cohen has failed to show that he has reasonable fear of incrimination from answering these questions. Cohen should be compelled to respond.

6.    The Location of Cohen's Office

Citing his Fifth Amendment rights, Cohen also refused to answer questions about the location of his office.  *See* Dkt. 248-2, at p. 56:4-13.  To justify the

invocation, Cohen again argues that answering the questions would potentially place him in the proximity of one of the defendants who has been accused of fraud.

As noted previously, proximity to one of the defendants, without more, is insufficient to establish criminal liability. There are no facts in the record which show that answering questions as to Cohen's office location would be incriminating to Cohen. Thus, the Special Master finds that Cohen does not have a reasonable fear that answering this question would incriminate him. He should answer the questions.

7.    Recognition of signatures

At various points during the deposition, Cohen was asked if he recognized signatures of various individuals.

First, early in the deposition, Plaintiff asked Cohen about a document that Cohen had previously produced in response to a subpoena. *See* Dkt. 248-2, at pp. 59:7 to 60:3. The document, which was purported to be a corporate manager certificate for Southern Division, contained several individuals' signatures.[5] Plaintiff asked if Cohen recognized a signature next to the printed name of "Michael Cohen," and the purported signatures of Pounders and Kantor. *See* Dkt. 248-2, at p. 59. Cohen pleaded the Fifth Amendment and refused to answer these

---

[5] The Deposition transcript references the document as Exhibit 241. This Exhibit was not attached to Plaintiff's Motion to Compel.

questions.  *Id*.

Moreover, as reflected on page 81 of Cohen's deposition transcript, Cohen refused to answer whether he recognized the purported signatures of Stu Kagan, Michael Cohen, Kantor, Pounders, Stanley Sax, and Michele Ross Pounders that were located on the signature page of an Operating Agreement of KMT Ventures LLC.  *See id*., at 75; 81.

To justify his invocation, Cohen argues that the documents "speak[] for themselves," and that if the document is somehow a part of the evidence presented at a criminal proceeding, verifying even his own signature would be incriminatory. Moreover, Cohen points out that there were allegations throughout the case that certain signatures were forged.  As such, Cohen believes that acknowledging the signatures would be incriminatory.

Cohen's arguments are unpersuasive.  First, the questions themselves do not appear to elicit incriminating testimony.  Second, nothing in the record suggests that these signatures that Plaintiff was seeking to verify were forgeries or that Cohen was involved in, or knew about, any such forgery.  Third, at this point, it is pure speculation that any of the documents shown to Cohen would be used against Cohen in any criminal case, and that acknowledging his own signature or his recognition of other individuals' signatures would somehow incriminate him.

As such, the Special Master finds that Cohen does not have a reasonable belief that his answers to these questions would be incriminating.  He should answer these questions.[6]

### 8.    Exhibit 202 and Other Financial Statements

Plaintiff asked Cohen about Exhibit 202 to the deposition, which appears to be a balance sheet dated April 30, 2014 for Southern Division that Cohen produced to Plaintiff during discovery.[7]  Dkt. 248-2, at p. 69:3-10.  When asked how Cohen obtained this document, Cohen raised his Fifth Amendment privilege. *See id*. Plaintiff also questioned Cohen about specific financial transactions reflected in Southern Division's financial records, and whether the financial statements were accurate reflections of Southern Division's financial condition. Dkt. 248-2, at pp. 70:22 to 73:12.  Cohen again refused to answer based on Fifth Amendment privilege.  *Id.*

During the *in camera* hearing, Cohen argued that answering these questions would put him in proximity of accounting and financial records that "may have been involved" in the alleged fraud.  Other than this argument, Cohen offered no

---

[6] There are several other instances where Cohen refused to answer questions related to his recognition of individual signatures.  For similar reasons, Cohen should answer the questions regarding whether he recognizes anyone's signatures.

[7] Plaintiff did not attach Exhibit 202 to its Motion to Compel, and Defendant did not provide a copy at the *in camera* hearing.

facts to establish how the answers would incriminate him individually.  Contrary to Cohen's arguments, Cohen's proffered information demonstrates that Cohen may not have any knowledge at all as to the contents of these documents, or at least as to the alleged false information contained therein.  If Cohen has no knowledge as to the contents of the documents, the answers to the questions cannot be deemed to be incriminating.

Thus, the Special Master finds that there is no reasonable cause to believe that the answers to these questions would incriminate Cohen, and he should be compelled to answer the questions posed.

### 9.     Questions Regarding Third-party Corporations

Plaintiff also asked Cohen questions about the following entities:

KMT Ventures,[8] Beach Retreat Properties,[9] Main Street Ventures,[10] KMT Group,[11] KMT Group of Delaware,[12] Falls on Lake Appalachia LLC,[13] Royal Parkway Partners,[14] North Peachtree Partners,[15] Midtown Imports,[16] International Boulevard

---

[8] *See* Dkt. 248-2, at pp. 75-77; 89:17 – 90:21.
[9] *See id*., at p. 78.
[10] *See id*., at p. 80.
[11] *See id*., at pp. 85; 91-94; 98:23 -102:7; 148:13 to 149:6.
[12]  *See id*., at p. 95-97:20.
[13] *See id*., at p. 87.
[14] *See id*., at pp. 88; 151:13 to 152:7.
[15] *See id*., at pp. 149:25 to 150:17.
[16] *See id*., at pp. 127 to 142:5.

Partners, LLC,[17] Idle Hour,[18] BDKK LLC,[19] KIC Foods,[20] KIG Trust,[21] RJL Trust,[22] Callahan Trust,[23] Clarisy Group,[24] KP Ventures,[25] Rossi Ventures,[26] Southern Foods of Greensborough,[27] and Trinity Consulting.[28]

Generally speaking, for each of these entities, Plaintiff asked Cohen whether he has an ownership interest in the entity, whether Kantor or Pounders have an ownership interest, the sources of income for the entities (particularly if there are checks written from Service Foods to that entity), the circumstances surrounding how the entity was formed, and the nature of the business relationship between Service Foods and the entity.

Cohen raised his Fifth Amendment rights and refused to answer any of these questions. He first points out that Plaintiff alleges in the Demand Letter that Cohen was a minority or indirect owner of several of these entities that allegedly received funds that flowed from the fraud. Thus, Cohen argues that answering

---

[17] *See id.*, at pp. 145:2 to 146:17; 185:15-22.
[18] *See id.*, at p. 88.
[19] *See id.*, at pp. 142:13 to145:1.
[20] *See id.*, at pp. 146:18 to147:16.
[21] *See id.*, at pp. 107; 147:17 to 148:12.
[22] *See id.*, at p. 107.
[23] *See id.,* at p. 107.
[24] *See id.*, at p. 102:8 to 106:10; 107:19 to108:8; 110:25 to 111:5.
[25] *See id.*, at pp. 149:7 to 149:24.
[26] *See id.*, at pp. 150:18 to 151:12; 153:17 to 154:3.
[27] *See id.*, at pp. 166:14 –to 167:7.
[28] *See id.*, at pp. 170:5 to 171:1.

these questions establishes a connection to the alleged fraudulent funds and would provide a "link in the chain" of evidence that can be used against him.

The Special Master finds that the proffered facts in the record are insufficient to support a reasonable belief that the answers to these questions would incriminate Cohen. First, based on the proffered information, it appears that Cohen has no connection or knowledge of some of the entities that Cohen was asked about. Second, to the extent these entities were indirectly owned by Cohen, there is nothing in the record to suggest that Cohen actually knew or should have known about the financial transactions that occurred between Service Foods and these entities. Third, although the Plaintiff alleges that Cohen "indirectly received" disbursements, *see* Demand Letter at p. 2, there are no facts submitted by either side to support that assertion other than Plaintiff's blank allegation that the funds from Service Foods were transferred to entities of which Cohen owned a minority share. Even so, Cohen does not show how the entity – for which he is a minority owner – receiving funds would incriminate him *individually*, especially when there is no evidence in the record that money was further transferred to his personal account. In other words, Cohen did not proffer facts to support any "link" that could support a finding of reasonable cause to fear incrimination. His fear of prosecution appears to be based on speculation and hypothetical possibilities that

are too remote to be reasonable.

Therefore, the Special Master recommends that Cohen be compelled to answer all of the questions related to the non-defendant entities.

10.    Questions Regarding Former Employees of Services Foods.

Cohen also refused to answer any questions related to employees or alleged employees who worked at Southern Foods or Southern Division.  For example, Plaintiff showed Cohen a list of employees and asked if any one of the individuals listed were employed by Service Foods or Southern Division, and whether Cohen had worked with any of those individuals.  Cohen refused to answer the question, citing his Fifth Amendment rights.  *See* Dkt. 248-2, at p. 121:2-11.  More specifically, with respect to Sandip Sharma, Garlin Smith, and Cynthia Thompson – who were all alleged former employees of Service Foods – Cohen refused to answer questions regarding the positions these individuals held at Service Foods. *See id.,* at pp. 125:23 -126.  Later in the deposition, Cohen refused to answer any and all questions related to Josephine Kantor and Lynn Pounders, who were also alleged to be employees of Service Foods.  *See* Dkt. 248-2, at pp. 157:18 to 158:23; 160:12 to 161:8.

Cohen argues that if he were to answer these questions, he would be acknowledging his knowledge of operations of Service Foods and of individuals

who have connections to Kantor and Pounders. This would, he argues, bring him one step closer to those who allegedly committed the fraud.

The Special Master finds that the answers to these questions would not have a tendency to incriminate Cohen. While Cohen may be correct that answers to these questions may show some knowledge about Service Foods or Southern Division, identifying those who worked at these companies and their roles, without more, cannot be viewed as incriminating to Cohen. It cannot be disputed that Cohen worked for Service Foods, and as such, he is presumed to know certain aspects of its operations.  Merely identifying employees does not reveal what Cohen did or knew with respect to the alleged fraud in the case.  Additionally, it is pure speculation at this point to believe that these employees would have any potentially incriminating information on Cohen.  Cohen's "fear" appears to be based on his desire not to be involved in any of the pending proceedings, and not because there is reasonable cause to fear incrimination.

Therefore, Plaintiff's Motion to Compel should be granted and Cohen should answer these questions.

### 11.    Questions Related to Schreeder Wheeler & Flint

Cohen also refused to answer questions related to Schreeder Wheeler & Flint, an Atlanta-based law firm. *See* Dkt. 248-2, at pp. 152:16 to 153:10.  Plaintiff

asked Cohen about specific payments made to the law firm, and whether the law firm performed any services for Kantor or Pounders.  *See id.*

Cohen raised his Fifth Amendment rights and refused to answer these questions.  Cohen argues that answering these questions would indicate Cohen's knowledge as to who Service Foods' attorneys were.  This information, he further argues, would get him "closer to the chain of command" of Service Foods.

Cohen's argument is without merit.  Even assuming that Cohen knows the name of Service Foods' attorney, nothing about that fact shows Cohen's involvement regarding the alleged fraud.  The record is devoid of facts that the law firm would have any information about Cohen, or that it performed any work for Cohen or by his direction.  As such, Cohen's fear is too remote to be reasonable and not factually-based.

Cohen should be compelled to answer these questions.

12. Whitebridge Financial and Equitable Acceptance Corporation

Plaintiff spent a considerable amount of time asking Cohen about all transactions between Services Foods, Whitebridge and EAC. *See* Dkt. 248-2, at pp. 171:11 to 182:19; 186:1 to 200; 282:1-8. Cohen refused to answer virtually all of these questions. *See id.* To support for his invocation, Cohen argues that answering these questions would put him closer to the inner workings of the finances of the

company, which would potentially expose him to liability.

During the *in camera* hearing, however, Cohen neither revealed what he knows about the finances of the company nor how answering these questions would incriminate him individually. First, the wording of the questions does not show how answering them would somehow incriminate Cohen. The Plaintiff did not ask what Cohen has done with respect to transactions involving Whitebridge and EAC. The questions are generally designed to elicit testimony about what other individuals – e.g., Kantor and Pounders – and the corporate defendants did with respect to certain transactions involving Whitebridge and EAC. Second, merely knowing the circumstances surrounding what other individuals have done does not equate to criminal liability for Cohen. Cohen's knowledge, if he has any, without any evidence or allegations of Cohen's willing participation in the alleged fraud, is insufficient for a finding of incrimination.

As such, the Special Master finds that answering these questions would not incriminate Cohen, and he should be ordered to answer them.

### 13.  Kantor's Resignation

Cohen refused to answer questions surrounding Kantor's resignation from Service Foods:

Q:    When did Kantor withdraw – when did Kantor resign from Service Foods?

> A:     Fifth Amendment.
> Q:     What were the circumstances? Was he asked to resign or did he voluntarily resign?
> A:     Fifth Amendment.
> Q:     Have you had any conversations with Mr. Kantor leading up to his resignation concerning his potential resignation?
> A:     Fifth Amendment.
> Q:     Or any subsequent conversations with Mr. Kantor as to why he resigned?
> A:     Fifth Amendment.

Dkt. 248-2, at p. 202. The Plaintiff also asked Cohen about the substance of the actual resignation letter. *See id*., at pp. 204 to 205:4. Cohen refused to answer these questions as well. *See id*.

During the *in camera* hearing, Cohen did not provide information as to what his answers would have been to these questions. Instead, Cohen argued that answering these questions would lead to "information related to the fraud because the fraud may be related to his resignation." Cohen did not elaborate on what the connection would have been, however.

Based on the record, the Special Master finds that the questions do not incriminate Cohen. The Plaintiff is not asking about what Cohen did, but what Kantor did. Moreover, apart from the conclusory statement that the answer can somehow lead to information related to the fraud, Cohen offered no facts to show what information it would show, and how that information may be incriminating to

him.  Cohen should be directed to answer these questions.

      14.    Dissolution of Service Foods and Formation of Ellsworth Foods

Plaintiff also questioned Cohen about the circumstances surrounding the dissolution of Service Foods and his involvement in that process. *See id.,* at p. 205:5-22.  In relation to the dissolution, Cohen was further asked about the start of a new business named Ellsworth Foods, and whether Ellsworth Foods operated using the same employees of Service Foods and had former Service Foods customers. *See id.,* at pp. 205:23 to 207; 214:13-14. Cohen raised his Fifth Amendment rights and refused to answer these questions, as well as additional questions about the sales documents between Service Foods and Ellsworth Foods. *See id*., at p. 217:20 to 218:22.

Cohen argues that answering these questions would show that he has knowledge of "inner workings" of Service Foods – which would potentially place him in a conspiracy to commit fraud.

The Special Master disagrees.  Cohen failed to present facts to explain why Service Foods was dissolved, and circumstances surrounding the formation of Ellsworth Foods.  Further, it is unclear from the record what role, if any, Cohen played in these events.  Thus, the record does not support a finding that Cohen could be viewed as a member of the alleged conspiracy, or how answering these

questions would incriminate him individually. The mere fact that Cohen worked as a consultant at Service Foods, and that he continued in that role for Ellsworth Foods, does not provide a reasonable basis for him to fear incrimination. Absent some factual basis to believe Cohen could be viewed as a willing participant in the alleged fraud, or that he somehow aided and abetted the alleged fraud, these questions cannot be viewed as eliciting incriminating responses.

As such, he should answer these questions.

15.    Cohen's E-mail Address

Cohen refused to provide the email address he uses for his business. *See id.*, at p. 221:6 -10.

To justify this invocation, Cohen argues that his email domain was hosted by one of the Defendant companies that is alleged to be involved in the fraud.

The Special Master does not find Cohen's stated reason to be sufficient to show a reasonable risk of incrimination.  It cannot be disputed that he has a connection to the Defendants, and that he worked as a consultant at one of the Defendant companies.  Therefore, it is entirely reasonable to believe that he may have an email address that would have been hosted at one the companies. This fact alone cannot be considered incriminating.

He should be directed to answer this question.

16.    Accounting Systems of Service Foods and Ellsworth Foods

Cohen also refused to answer some questions about the accounting and record keeping systems at Service Foods.  *See* Dkt. 248-2, at pp. 230:21 to 232:19; 237:2-11.   For example, Plaintiff asked Cohen if he recognized the accounting software/systems used by Service Foods – e.g., SAP system, THEOS, the FOE system, the Vtiger system and the 3X accounting system – and whether telephone calls into Service Foods were recorded.  *See id*.

During the *in camera* hearing, Cohen again argued that answering these questions would show his knowledge of the "inner workings" of Service Foods. As discussed above, this argument should be rejected.  The record does not show what knowledge of the "inner workings" he possesses, and more importantly, Cohen failed to show how acknowledging his knowledge of Service Foods' accounting and IT systems would be incriminating to him. Thus, Cohen should answer these questions.

17.    Documents Submitted to the Bank and the Overall Financial Condition of Service Foods

Cohen refused to answer all questions Plaintiff posed to him regarding the aging reports, borrowing certificates, and the overall financial condition of Service Foods.  *See id.,* at pp. 237:20 – 249. Cohen argues that these questions are at the center of the fraud allegations against the named defendants, and thus, Cohen's

knowledge of the reports "could be considered incriminating by a U.S. Attorney." Apart from this statement, Cohen did not provide any additional facts explaining what knowledge he actually has regarding these reports and how that knowledge, if any, would incriminate him personally.  To the contrary, the proffered facts seem to indicate that Cohen was not involved in the financial side of Service Foods and, thus, he has little, if any, risk of incrimination from answering these questions.

Plaintiff does ask Cohen about his awareness of the incorrect information contained in the aging report. *See id.*, at pp. 241:5 – 12. The record does not demonstrate that Cohen knew of any falsity.  Regardless, even if he knew, the record is still insufficient to reasonably find that he was a member of the alleged conspiracy. There is no evidence or even an allegation in the record that he was actually involved in the submission of false information to the Plaintiff or that he somehow aided and abetted others in doing so.

For these reasons, the Special Master finds that Cohen's fear of incrimination is unreasonable as to the questions posed to him.  He should answer all of these questions.

18.    Kantor or Pounders' Use of Company Funds

Plaintiff asked the following questions to Cohen regarding Pounders and Kantor:

> Q:    Did Mr. Pounders use any money or property of the Service
> Foods companies to fund th[e] settlement [with Bank of North
> Georgia]?
> A:    Fifth Amendment.

*Id.* at 263:22-25.

> Q:    Did Mr. Kantor or Mr. Pounders, to your knowledge, ever
> utilize assets of the Service Foods companies to settle any lawsuits or
> claims of their personal creditors?
> A:    Fifth Amendment.
> Q:    Did Mr. Pounders or Mr. Kantor ever utilize assets of the
> Service Foods companies to make payments on any debts[]?
> A:    Fifth Amendment.

*Id.* at 266:17 to 267:2.

To justify his invocation, Cohen argues that he has a reasonable fear of

incrimination because the answers may reveal his knowledge of specific financial

transactions of Service Foods.

This argument is without merit. First, the questions are directed at the

activities of Pounders and Kantor and are not designed to elicit testimony that

could be viewed as incriminating to Cohen.  Second, there is nothing in the record

that shows that Cohen had any knowledge with respect to these transactions.

Third, Cohen failed to demonstrate how the answers would be incriminating as to

him, even if he is shown to have knowledge about the transactions.

In light of the record, the Special Master finds that Cohen does not have a

reasonable cause to fear incrimination as to these questions. He should answer these questions.

19.    Personal Business Dealing With Pounders or Kantor

When asked about various investment businesses that Cohen may have with Pounders and Kantor, Cohen asserted his Fifth Amendment rights. *See id.* at p. 267:3 to 268:2-13.

To justify his invocation, Cohen refers back to the allegation contained in the Demand Letter that some of the entities listed therein are partially owned by Cohen, and that the money derived from the alleged fraud flowed from Service Foods into these entities.  Therefore, he argues, this link provides him a basis for reasonable fear of incrimination.

This argument is unpersuasive.  First, as noted before, there is no evidence in the record to find that the money actually flowed from Service Foods to the entities listed in the Demand Letter, and even if it did, that the money was further transferred to Cohen individually.  Second, despite providing him an opportunity to do so, Cohen failed to explain and proffer facts showing what outside investments he has with Pounders or Kantor, if any, and why answering these questions would be incriminating as to him.

Merely being connected to defendants who are alleged to have committed a

fraud, without more, is insufficient to make Cohen's fear of incrimination a reasonable one.  As such, the Special Master finds that Cohen's invocation of his Fifth Amendment rights was improper.  Cohen should be required to answer these questions.

IV.   CONCLUSION[29]

Having reviewed each of these questions and the totality of facts submitted by Cohen, the Special Master finds that Cohen does not have a reasonable fear of incrimination by answering these questions. Cohen's fear of incrimination is unsupported by facts and is based on bald conclusions and speculations that are too remote to be reasonable. In light of Cohen's role in Service Foods, the lack of specific allegations of misconduct against Cohen, and the absence of facts demonstrating reasonable probability of Cohen's criminal liability, the Special Master does not find Cohen's fear of incrimination to be reasonable.

Therefore, the Special Master recommends that Plaintiff First Tennessee's Motion to Compel Non-Party Michael Cohen to Answer Questions in Continued Deposition [Dkt. 234] be GRANTED and that Cohen be compelled to answer all of the questions posed by Plaintiff during his prior deposition.

---

[29] Cohen also raised his Fifth Amendment rights and refused to answer questions posed by Mr. Pounders' counsel.  Since Mr. Pounders did not move to compel an answer to his questions, however, those invocations are not addressed.

This 10th day of October, 2017.

*S/ Byung J. Pak*
BYUNG J. "BJAY" PAK
SPECIAL MASTER

<u>**CERTIFICATE OF COMPLIANCE AND SERVICE**</u>

This will certify that the foregoing pleading was prepared using Times New Roman 14pt Font, and that I have this day filed the foregoing using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

| | |
|---|---|
| Kevin A. Stine<br>Kathleen G. Furr<br>Brett A. Switzer<br>**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**<br>Suite 1600, Monarch Plaza<br>3414 Peachtree Street, NE<br>Atlanta, GA 30326<br>kstine@bakerdonelson.com<br>kfurr@bakerdonelson.com<br>bswitzer@bakerdonelson.com | Richard B. Gossett<br>**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**<br>633 Chestnut Street<br>Chattanooga, TN 37450<br>rgossett@bakerdonelson.com |
| Ryan A. Kurtz,<br>**Miller & Martin, PLLC**<br>Suite 2100<br>1180 West Peachtree Street, NW<br>Atlanta, GA 30309<br>rkurtz@millermartin.com | Elizabeth B. Hodges<br>Brent W. Herrin<br>Garrett H. Nye<br>Gustav H. Small, Jr.<br>**Cohen Pollock Merlin & Small**<br>3350 Riverwood Pkwy, Suite 1600<br>Atlanta, GA 30339<br>ehodges@cpmas.com<br>bherrin@cpmas.com<br>gnye@cpmas.com<br>gsmall@cpmas.com |

| | |
|---|---|
| Todd E. Hatcher<br>H. Scott Gregory, Jr.<br>**Gregory, Doyle, Calhoun & Rogers, LLC**<br>49 Atlanta Street<br>Marietta, GA 30060<br>thatcher@gregorydoylefirm.com<br>sgregory@gregorydoylefirm.com | Brian Steel<br>**The Steel Law Firm**<br>1800 Peachtree Street, NW<br>Suite 300<br>Atlanta, GA 30309<br>thesteellawfirm@msn.com |
| Walt Britt<br>**Chandler, Britt & Jay LLC**<br>4350 South Lee Street<br>Buford, Georgia 30518<br>wbritt@cbjblawfirm.com | Charles Edgar Hoffecker<br>**Ney Hoffecker Peacock & Hayle LLC**<br>1360 Peachtree Street, NE<br>One Midtown Plaza, Suite 1010<br>Atlanta, GA 30309<br>chad@nhelaw.com |

Dated: October 10, 2017.


 *S/ Byung J. Pak*_____
BYUNG J. "BJAY" PAK